**Michael D. REMMERS and Robert Loney, Plaintiffs,**

v.

**Lou V. BREWER, Warden, et al., of the Iowa State Penitentiary at Fort Madison, Iowa, Defendants.**

Civ. No. 72–177–2.

United States District Court, S. D. Iowa, C. D.

July 24, 1973.

Robert Bartels, Iowa City, Iowa, Barry A. Lindahl and Robert N. Clinton, College of Law, U. of Iowa, Iowa City, Iowa, for plaintiffs.

Thomas R. Hronek and Lorna L. Williams, Asst. Attys. Gen., De Moines, Iowa, for defendants.

## MEMORANDUM AND ORDER.

HANSEN, Chief Judge.

This is an action brought under 42 U. S.C., Section 1983 by two inmates of the Iowa State Penitentiary at Fort Madison, Iowa, against the Warden and other prison officials. Petitioners aver that as members of the Church of the New Song they are being denied the right to practice their religion in violation of the First Amendment. They furthermore claim that certain practices of the prison's Diagnostic Committee, which makes recommendations to the Parole Board, violate the Establishment Clause of the Constitution.

## FINDINGS OF FACT

There is no substantial dispute between the parties concerning the facts which gave rise to this controversy. Plaintiffs Michael Remmers and Robert Loney are both presently incarcerated at the Iowa State Penitentiary, a maximum security institution operated by the State of Iowa. Defendant Brewer is the warden at the prison. Defendant Ray is the Protestant chaplain at Fort Madison and defendant Hoenig is the Catholic chaplain. The two chaplains have primary responsibility for conducting religious programs at the prison, subject to review by the warden. Both chaplains are also members of the prison's Diagnostic Committee, which is composed of seven members of the prison supervisory staff. The Diagnostic Committee meets in rotating groups of three to meet with and interview prisoners prior to their appearance before the Parole Board. Following these interviews, the Diagnostic Committee submits reports to the Parole Board with recommendations as to the prisoner's suitability for parole. It is this participation by the chaplains in the parole process which petitioners claim violates the First Amendment.

In late 1971 or early 1972, plaintiff Remmers was involved in the founding of a group known as T.R.U.T.H., an acronym for To Religious Understanding Through Hope. This organization, in which plaintiff Loney was also involved, apparently functioned as an informal discussion group with religious overtones. Shortly after the founding of T.R.U.T.H., Remmers approached Reverend Ray on behalf of the group and requested permission to hold formal meetings and use prison facilities. This request was denied by Reverend Ray because he felt that T.R.U.T.H. was not a "recognized" religion and had no established counterpart or sponsor outside the prison.

Sometime after this encounter, Remmers and other T.R.U.T.H. members became acquainted with an order known as the Church of the New Song and the teachings of its founder, one Harry Theriault. Following this acquaintanceship, Remmers, Loney, and a number of other inmates became members of the Church of the New Song and carried on correspondence with Bishop Harry Theriault and other Church of the New Song functionaries. Remmers and Loney then again approached Reverend Ray and Father Hoenig. They expressed their belief in the Church of the New Song and indicated to both chaplains that a sizeable number of inmates were interested in the new faith. Their request for meeting facilities and formal scheduling of Church of the New Song activities was denied by the chaplains with the explanation that the church was not a recognized religion. Plaintiffs then pressed their cause directly to Warden Brewer, presenting to him a petition with some 102 signatures of inmates purportedly interested in possibly attending Church of the New Song services. Their request was again denied on the grounds that the Church of the New Song was not a recognized or genuine religion. Plaintiffs claim that the failure of prison authorities to accommodate their beliefs by granting them facilities and time to practice their religion violates rights guaranteed to them under the First Amendment.

Plaintiffs filed a *pro se* complaint in this Court on August 3, 1972, seeking the following relief: (1) That Warden Brewer be ordered to allow the Church on the New Song membership to fully practice their religion by (a) gathering together for religious meetings and services, (b) receiving and possessing religious literature, (c) being allowed to study and discuss Church of the New Song precepts, (d) being allowed to correspond with other members of their faith; (2) That Warden Brewer be ordered to direct all prison personnel to grant the above rights to Church of the New Song members; (3) That the prison chaplains be enjoined from participating in any manner in Diagnostic Committee interviews or reports which may affect parole eligibility; (4) That the two chaplains be enjoined from sub-

mitting oral or written reports to the Diagnostic Committee concerning the religious activities of inmates.

Petitioner's cause was tried to the Court on February 22, 1973 and February 23, 1973. Besides the plaintiffs themselves, three other Church of the New Song members testified on their behalf: Coadjutor Richard Tanner, International Ambassador Becky Hensley, and Dr. Stephen Fox, a professor of Psychology for the University of Iowa. The defense presented as witnesses Warden Lou Brewer, the defendant Reverend Ray, and James Riggsby, a program director at the U.S. Federal Penitentiary in Atlanta, Georgia, where the Church of the New Song was apparently founded.

## IS THE CHURCH OF THE NEW SONG A RELIGION?

The threshold determination to be made in this case concerns whether or not the Church of the New Song is a religion so as to come under the protection of the First Amendment. This question has previously been considered by a federal court in Theriault v. Carlson, D.C., 339 F.Supp. 375 (1972). *Theriault* involved constitutional claims and issues substantially similar to the present case. Inmates at the Atlanta federal pentitentiary claimed that as Church of the New Song members they were being denied the right to freely and meaningfully practice their religion in violation of the First Amendment. The prison authorities defended their actions by asserting that the Church of the New Song was merely a sham and a front to disguise disruptive or revolutionary activities. Since the Church of the New Song had been founded by an inmate at the Atlanta penitentiary, Bishop Harry Theriault, the court in Theriault v. Carlson was in a unique position to review at first hand the foundations and activities of this new faith. The court there concluded that the Church of the New Song was a religion and as such was entitled to the full protections of the First Amendment. After a careful review of the evidence

presented at the trial of this cause, this Court agrees with the conclusion of Judge Edenfield in Theriault v. Carlson.

■ In the first instance, the Court notes that the preferred position of religious freedoms in our constitutional plan demands that a federal court view religious claims with great solicitude lest these vital freedoms be extinguished. Nor is the Court lightly disposed to overturn the finding of a sister court, particularly where that court had the advantage of perspective enjoyed by the court in Theriault v. Carlson, *supra*.

■ The term "religion" is not defined in the Constitution. Indeed, a succinct and comprehensive definition of that concept would appear to be a judicial impossibility. The relatively few cases dealing with the subject indicate, however, that the concept is to be given a wide latitude in order to insure that state approval may never become a prerequisite to the practice of one's faith. See Fulwood v. Clemmer, D.C., 206 F. Supp. 370 (1962); Theriault v. Carlson, *supra*. See also United States v. Seeger, 380 U.S. 163, 177, 85 S.Ct. 850, 13 L.Ed. 2d 733 (1965); Welsh v. United States, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970).

The testimony at the trial of this cause adduced a great deal of information concerning the foundations and precepts of the Church of the New Song, much of which is contained in Theriault v. Carlson, *supra*, and need not be reiterated here. What the testimony did show, however, is that the Church of the New Song qualifies as a religion even under a narrow construction of that term.

The primary bond between Church of the New Song members appears to be their belief in an inanimate and supreme force or spirit called Eclat, which they believe pervades all things. The Eclatarians apparently believe that Eclat is a unifying and harmonizing spirit which unites all men in brotherhood. Thus Eclat may be seen to occupy roughly the same relative position in the Eclatarian

faith as the Christian God or Hinduism's Brahma. Eclatarians view Jesus and other Christian figures as great teachers and spiritual leaders who are nonetheless subordinate to Eclat. Thus plaintiffs do not feel that they are a Christian sect or that their religious needs can be fulfilled under the existing opportunities for Protestant or Catholic services. Important writings in the Eclatarian faith include the Bible and a series of "Demandates" and "Exegetic Missives" issued by the spiritual leader of the faith, Bishop Harry Theriault. These latter writings have been included in a volume or Eclatarian Bible which serves as the primary source of Eclatarian teachings.

The testimony of Richard Tanner and Becky Hensley showed that the Eclatarian movement is no longer confined only to the inmates of two federal penitentiaries, as was the case when the *Theriault* opinion was written. Rather, the Church of the New Song appears to have spread both within and without penal institutions across the country. According to the testimony of Miss Becky Hensley, International Ambassador of the Church of the New Song, the church has established purlieus (congregations) not only in Fort Madison and Iowa City, Iowa, but in many other states. Furthermore, it was evident to the Court that non-convicts as well as state and federal prisoners are now members of the Church of the New Song. Dr. Stephen Fox, a member of the church and a professor of psychology, testified as to the rehabilitative effects of Eclatarianism on prison inmates in particular and on people in general. The therapeutic value of Eclatarianism was enunciated by Richard Tanner, Special Envoy to the Bishop of Tellus (*i.e.*, Harry Theriault) and a National Co-Adjutor of the Church of the New Song.

While there is no recognized body of dogma for the Eclatarian faith and each member of the Church is apparently free to embrace or reject whatever portions of Eclatarian teaching he or she wishes, the only absolute requirement for membership being a firm belief in Eclat. There was no evidence that any of the tenets of Eclatarianism, such as they may be, includes calls to violence or defiance of authority. Nor was there any evidence presented linking the religious activities of Church of the New Song members at Fort Madison to disruptions or disturbances at the prison.

Although much of the precise meaning of Eclatarianism may escape the Court, and no matter how strange or bizarre its origins and fundamentals may appear to some, it is beyond serious doubt that it possesses many of the characteristics associated with traditional "recognized" religions. The state has not shown the insincerity or fraudulent nature of the petitioners' professed beliefs. Even without the precedential weight of the *Theriault* decision, the Court would be constrained to find that the Church of the New Song at this time constitutes a religion entitled to the protection of the First Amendment.

The state does not appear to deny this conclusion directly, but argues that in a prison context some initial showing of legitimacy is required for administrative purposes before a group alleging to be a religion is entitled to the protection of the Free Exercise Clause. In support of this position, the state relies on Long v. Parker, 390 F.2d 816, 820 (3rd Cir. 1968); Banks v. Havener, D.C., 234 F.Supp. 27, 29 (1964), and Sostre v. McGinnis, 334 F.2d 906, 908–909 (2d Cir. 1964). Without reviewing the particular statements in these cases from which the state's argument is drawn, it suffices to say that they cannot begin to support the broad and novel principle that is proposed. Moreover, the state's argument suggests that prison administrators have the power to decide which religions are "recognized" and legitimate and which are not. Such a notion strikes directly at the freedom from governmental approval of secular religion which is at the core of the First Amendment's Establishment Clause. See *e.g.* Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).

Apart from the fact that the petitioners here have plainly made a *prima facie* showing of legitimacy, the requirement proposed by the state is patently unsound and cannot stand. The Court is not insensitive to the problems of a prison administrator faced with a profusion of religious claims by those whose faith may appear both strange and incomprehensible, if not downright false and insincere, but that concern cannot justify a voyage into the uncharted hazards of religious censorship. It is neither for a court or a governmental official to rule on the truth or falsity of a religious faith. Such questions are clearly placed beyond the pale of governmental decision-making by the First Amendment. The only appropriate and relevant inquiry is whether or not the Church of the New Song is a religion and whether the plaintiffs possess a sincere and good faith belief in that creed. United States v. Ballard, 322 U.S. 78, 64 S.Ct. 882, 88 L.Ed. 1148 (1944); United States v. Seeger, *supra*.

■ Although prison authorities and reviewing courts may be naturally reluctant to believe in the sincere religious conversions of those whose past conduct would seem to make such events unlikely, there is simply insufficient evidence to support the contention that plaintiffs' beliefs are not sincere and genuinely felt.

For all the above-mentioned reasons, the Court finds that the Church of the New Song is a religion within the ambit of the First Amendment.

■ Given these findings, the plaintiffs' remedy at law is clear. When the state seeks to justify the granting or withholding of benefits and privileges based on religious classifications, the Equal Protection Clause of the Fourteenth Amendment demands that the state present a compelling interest which is served by the discrimination.[1]

Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). The principle is equally applicable in a prison setting. Walker v. Blackwell, 411 F. 2d 23 (5th Cir. 1969); United States ex rel Jones v. Rundle, 453 F.2d 147 (3rd Cir. 1971); Brown v. Peyton, 437 F.2d 1228 (4th Cir. 1971). The state has not suggested nor does the Court perceive any compelling state concern which is forwarded by denying to Church of the New Song members the same rights of assembly and worship enjoyed by Protestant and Catholic inmates. It follows that the present non-recognition of the Church of the New Song is unconstitutional. Plaintiffs must be allowed the same rights of assembly, discussion, correspondence, ministerial visits, devotional facilities, etc. which are enjoyed by Protestant and Catholic inmates. See Theriault v. Carlson, *supra*; Fulwood v. Clemmer, *supra*; Walker v. Blackwell, *supra*; and Cooper v. Pate, 382 F.2d 518 (7th Cir. 1967). Of course the privileges allowed Church of the New Song devotees need only be substantially, not literally, equivalent. Prison authorities may properly take into account distinguishing factors such as the size of the group in providing facilities. Church of the New Song members are also subject to the same lawful orders and regulations concerning the internal affairs of the prison as other inmates. What is demanded is that Eclatarians be allowed a fair and meaningful opportunity to freely exercise their religion in the same degree as other inmates, Protestant and Catholic.

■ The Court is well aware of the possibility that the Church of the New Song may be only a sham religion created to serve as a convenient vehicle for the presentation of political claims. But the as yet unsubstantiated anxieties of this Court cannot justify the possible suffocation of religious freedoms. If the Church of the New Song should

1. It is probable that the result in the instant case would also be demanded by the principle of government neutrality in religious affairs, wherein the state may not favor one religion over the other, or non-religion over religion. See Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968).

prove to be a hoax and front that the state claims it is, that eventuality can be dealt with by both the prison administration and this Court. Nor should it be thought that by granting the Eclatarians religious rights the prison administration is laying itself open to uncontrollable hazards. The prison administration has a strong interest in seeing that the facilities and benefits enjoyed by the Church of the New Song are not abused or used for other than religious purposes. Meetings can be observed or mail monitored to see that this is the case. Given the power vested in prison authorities to take reasonable precautions to prevent potential abuses, any phoney believers should find their jest most unrewarding. See Knuckles v. Preasse, 302 F.Supp. 1036 (E.D.Pa.1969), affirmed 435 F.2d 1255 (3rd. Cir. 1970), cert. den. 403 U.S. 936, 91 S.Ct. 2262, 29 L.Ed.2d 717 (1971) for a discussion of this problem.

## THE DIAGNOSTIC COMMITTEE ISSUE

Petitioners allege that the participation by chaplains Ray and Hoenig in the Diagnostic Committee, whereby they may be called upon to submit reports to the Parole Board concerning an inmate's suitability for parole, violates the Establishment Clause of the Constitution.

▉ Certainly the Constitution does not bar the State from providing chaplains in prisons for the spiritual edification of the inmates, so long as no particular religion is fostered thereby. Abington School Dist. v. Schempp, 374 U.S. 203, 296–299, 83 S.Ct. 1560, 1610; 10 L.Ed.2d 844 (1963) (concurring opinion Mr. Justice Brennan); Theriault v. Carlson, supra, 339 F.Supp. at 381; Horn v. People of California, 321 F.Supp. 961, 964 (E.D.Cal.1968). But plaintiffs claim that the submission of parole suitability reports by the chaplains here, whether written or oral, illegally entangles church and state and may influence the inmates' choice of religious activity. The argument essentially is that an inmate desiring a favorable report to the Parole Board may engage in religious services and activities which he would not otherwise take part in.

The involvement of the chaplains in the parole process at Fort Madison is neither direct nor substantial. Since the seven-member Diagnostic Committee meets in groups of three when interviewing prospective parolees, it is doubtful that a chaplain is always on the interviewing team. Nor is it established that the reports prepared by the chaplains deal solely or primarily with religious activities or lack thereof. The Court can find no basis to ban a person from sitting on any public body merely because he is a member of a particular religion or even a minister of that religion. In fact, the Court suspects that most members of public agencies or bodies are members of a particular religion.

If evidence were before the Court that a man's religious activities were determinative of his status of parole eligibility, this would cause concern to the Court if it evolved from the involvement of the chaplains in the parole process. Under this factual setting, there might be a violation of the First Amendment rights of an inmate seeking parole. The mere fact, however, that a Methodist, Catholic, Jew, Buddhist, Eclatarian or person of any other religion sits on a particular board or committee cannot establish a violation of the First Amendment.

▉ The Court also concludes that allowing these chaplains to submit oral or written reports or letters to the Diagnostic Committee does not violate the First Amendment unless it is established that a particular religion is fostered thereby. There is no evidence that an Eclatarian minister may not submit letters or reports to this Diagnostic Committee or that a minister of any faith may not submit information he desires about a particular inmate for any consideration of the Diagnostic Committee and Parole Board. The Court does not feel that the plaintiffs have made an adequate showing that a particular religion is being favored in the present pa-

role process or that the involvement of the chaplains in the parole process at the Penitentiary is otherwise improper.

## ORDER FOR JUDGMENT

In accordance with the Findings of Fact and Conclusions of Law stated herein, it will be ordered that the defendants shall grant to the Church of the New Song members at the Fort Madison Penitentiary the right to exercise their religion equally with other religions. It will be further ordered that the portion of the cause of action seeking to restrict the activities of the chaplains in the parole process is dismissed.

It Is Ordered that the above shall constitute the Findings of Fact, Conclusions of Law, and Order for Judgment in this cause of action.